**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-50073

SOUTHWEST RECREATIONAL INDUSTRIES, INC.,

Plaintiff – Appellee – Cross-Appellant,

VERSUS

FIELDTURF, INC., and FIELDTURF INTERNATIONAL, INC.,

Defendants – Appellants – Cross-Appellees.

Appeals from the United States District Court
for the Western District of Texas
(00-CV-63)

August 13, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

Southwest Recreational Industries, Inc. sued FieldTurf, Inc. and FieldTurf International, Inc.

(collectively "FieldTurf") for allegedly engaging in various unfair business practices. Both parties

now appeal various aspects of the jury's verdict and the district court's ruling. After carefully

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

reviewing the record, briefs, and relevant authorities, we affirm the district court on all grounds except for its award of attorneys' fees for Southwest's breach of contract claim.

## I. BACKGROUND

Southwest manufactures and sells a popular artificial grass product called "AstroTurf." Commonly referred to as a "conventional" turf product, AstroTurf is a carpet-like surface consisting of densely knitted fabric laid over a shock-absorbent foam pad. AstroTurf, and other artificial turf products, are used as playing surfaces in stadiums and other multipurpose sports arenas. From its inception in 1966 until the mid 1990s, AstroTurf was the dominant brand name in the artificial turf market. Although Southwest did not develop AstroTurf, it has manufactured and sold the product since it purchased the AstroTurf trademark from a competitor in 1994.

FieldTurf produces and sells a competing product, self-titled "FieldTurf" ("the FieldTurf product"). FieldTurf purchased the patent for its product in 1988 and originally commercialized it for use on golf courses and driving ranges.[1] In 1993, FieldTurf began marketing its product as a "next generation" playing surface for multipurpose athletic arenas. Commonly referred to as a "filled" turf surface, the FieldTurf product consists of individual blades of synthetic grass that are knitted together over an "infill" of sand and ground rubber. FieldTurf claims that its product is softer, safer, and more closely emulates real grass than conventional turf products like AstroTurf.

Southwest produces its own filled turf product called "AstroPlay." Although AstroPlay was originally designed with a sand and rubber infill, Southwest now markets it with a rubber-only infill.

---

[1] Before 1999, FieldTurf's principals conducted business through a predecessor corporation called SynTenniCo, Inc. Because the distinction between FieldTurf and SynTenniCo makes no practical difference in this case, we use the term FieldTurf to refer to the present FieldTurf companies, as well as their predecessor corporation.

AstroPlay was first installed in an athletic arena in 1989, before FieldTurf began competing for sports arena contracts. Since the mid 1990s, Southwest and FieldTurf have competed for most of the artificial turf contracts in this country.

The parties' legal squabbles began in 1998. In a separate lawsuit filed in the Eastern District of Kentucky (the "Kentucky lawsuit"), FieldTurf sued Southwest claiming that Southwest's use of sand and rubber infill in its AstroPlay product infringed FieldTurf's patent. That litigation ended in settlement (the "Kentucky settlement"), with the parties agreeing to four terms that are relevant to the present suit. First, FieldTurf agreed to dismiss the Kentucky lawsuit and to abstain from suing Southwest for infringing its patent. Second, Southwest agreed that, until FieldTurf's patent expired, it would sell AstroPlay "with an infill consisting entirely of resilient particles (rubber, cork, etc.)." (Again, the FieldTurf product features an infill mixture consisting of sand and rubber.) Third, both parties agreed to keep the terms of the settlement confidential. And fourth, both parties agreed that they would make only the following public statement regarding the settlement:

> The action in the United States District Court in Kentucky wherein [FieldTurf] has asserted claims of patent infringement and trade disparagement against Southwest . . . has been settled on terms acceptable to both parties and dismissed. The terms of the settlement are confidential.

The Kentucky settlement, however, did not end the parties' legal wrangling. Soon after settlement, FieldTurf began advertising that AstroTurf and AstroPlay were inferior to FieldTurf's products and that the Kentucky settlement prohibited Southwest from selling sand and rubber infills—a clear violation of the settlement's confidentiality provisions. These statements were part of an aggressive comparative advertising campaign whereby FieldTurf sought to portray its product as safer, more technologically advanced, and favored among professional athletes and athletic

-3-

organizations. As a result, Southwest began to lose a significant number of contracts to FieldTurf.

In January 2000, Southwest filed this suit against FieldTurf claiming that it infringed Southwest's trademarks, breached the confidentiality terms of the Kentucky settlement, and engaged in unlawful business practices, including false advertising, commercial disparagement, and tortious interference with contract. After a three day trial in November 2000, the jury found FieldTurf liable for breach of contract and false advertising, awarding Southwest $1,040,000 in actual damages and $500,000 in punitive damages. The jury did not find FieldTurf liable for tortious interference or commercial disparagement and issued an advisory verdict that FieldTurf did not infringe Southwest's AstroTurf trademark.

The district court entered a judgment on the jury's $1,040,000 actual damage award but declined to award Southwest any punitive damages. The court also adopted the jury's findings that FieldTurf was not liable for tortious interference, commercial disparagement, or trademark infringement, and it denied Southwest's motions for an accounting of profits and a permanent injunction on its trademark infringement claim. Although it was not necessary to the judgment, the district court made the additional finding that Southwest's AstroTurf trademark is not generic. Finally, the court amended its judgment to include $240,480 in attorneys' fees, significantly less than the $1.7 million in fees that Southwest had requested.

Neither party was satisfied with the judgment. FieldTurf appealed challenging the sufficiency of evidence for the actual damage award, the award of attorneys' fees, various aspects of the jury instruction, and the court's finding that "AstroTurf" is not a generic term. Southwest filed a cross appeal challenging the denial of relief on its trademark claims, the denial of a prejudgment interest award, and the amount of its attorneys' fee award. We address both parties' arguments in turn.

## II. DISCUSSION OF FIELDTURF'S CLAIMS

FieldTurf contends that the district court erred in denying its motion for judgment as a matter of law because there was insufficient evidence to support the jury's actual damages award. Specifically, FieldTurf argues that there is insufficient evidence to support Southwest's false advertising claims or a finding that FieldTurf's activities caused Southwest to lose profits on its AstroPlay sales.

We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court.[2] But when a case is tried by a jury, a Rule 50(a) motion is a challenge to the legal sufficiency of the evidence.[3] In resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party.[4] Thus, we will reverse the denial of a Rule 50(a) motion only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict.[5] "This is true even when the jury reaches a general verdict based on two alternative theories."[6]

### A. Sufficiency of Evidence on Southwest's False Advertising Claim

Under this highly deferential standard of review, we find sufficient evidence to support Southwest's false advertising claims. Section 43(a) of the Lanham Act prohibits businesses and

---

[2] Cozzo v. Tangipahoa Parish Council-President Gov't, 279 F.3d 273, 280 (5th Cir. 2002).

[3] Brown v. Bryan County, 219 F.3d 450, 456 (5th Cir. 2000).

[4] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

[5] Cousin v. Trans Union Corp., 246 F.3d 359, 366 (5th Cir. 2001).

[6] United States v. Cisneros, 203 F.3d 333, 344 n.5 (5th Cir. 2000).

individuals from misrepresenting the nature and quality of commercial products:

> Any person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[7]

In <u>Pizza Hut, Inc. v. Papa John's International, Inc.</u>,[8] we explained that a false advertising claim under the Lanham Act includes five elements:

> (1) A false or misleading statement of fact about a product;
> (2) Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers;
> (3) The deception is material, in that it is likely to influence the consumer's purchasing decision;
> (4) The product is in interstate commerce; and
> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.[9]

The first prong requires that the false advertising complained of involves, at the very least, a "misleading statement of fact" as opposed to mere "puffery." We have held that puffery comes in two forms: "(1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion."[10] In contrast, "a statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification."[11]

---

[7] 15 U.S.C. § 1125(a)(1)(B).

[8] 227 F.3d 489 (5th Cir. 2000).

[9] <u>Id.</u> at 495.

[10] <u>Id.</u> at 497.

[11] <u>Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.</u>, 784 F.2d 674, 679 (5th Cir. 1986).

Our cases also clarify a plaintiff's burden under the second and third elements. When a defendant makes "ambiguous or true but misleading statements," the plaintiff must show that consumers were actually misled.[12] But where a defendant has made literally false statements, the plaintiff need not demonstrate that the statements actually misled consumers, for we assume that false statements are materially deceptive.[13]

The exhibits in this case evince literally false statements of fact made by FieldTurf employees attempting to lure customers away from Southwest. For example, in a letter to Humboldt State University, FieldTurf's president attempted to dissuade the school from purchasing AstroPlay by highlighting FieldTurf's endorsement from its national spokesman, football coach Tom Osborne. The June 4, 1999 letter falsely states that FieldTurf had not paid for Mr. Osborne's endorsement: "He is not a paid endorser, but after his research into our product he is completely sold on it and its track record." The evidence shows, however, that FieldTurf and Osborne signed an agreement on February 19, 1999, whereby Osborne agreed to endorse FieldTurf's product in exchange for stock options.

FieldTurf also dishonestly boasted that its product was the only artificial turf approved by the Fédération Internationale de Football Association ("FIFA") for use in international soccer competitions. In its April 28, 2000 proposed bid to install a synthetic field at Gannon University, FieldTurf stated that its product had recently become "the first artificial surface ever approved by FIFA for all levels of international soccer, up to and including the World Cup Finals." The proposal went on to state that "[t]his wraps up months of investigation by FIFA on the safety and utility of

---

[12] Pizza Hut, 227 F.3d at 497. Contrary to FieldTurf's contention, the district court's instruction on materiality properly stated that Southwest was obligated to "present some evidence of actual deception" if it did not prove that FieldTurf made statements that were literally false.

[13] Id.

FieldTurf for soccer." In direct contradiction to that statement, however, Southwest presented a July 14, 2000 letter from FIFA's legal counsel asking FieldTurf to refrain from using the phrase "approved by FIFA," or any similar phrase, because FIFA had not approved any artificial surface for international competitions.

The statement that FIFA had approved FieldTurf's product, like the statement that Coach Osborne was an unpaid endorser, is an empirically verifiable, factual statement. Having shown that these statements (and several others like them) were literal fabrications, Southwest was not obligated to prove that FieldTurf actually deceived any given consumer. We therefore find sufficient evidence to support Southwest's false advertising claims and do not address whether there is sufficient evidence of actual consumer deception.

### B. Sufficiency of Evidence on Lost Profits

FieldTurf also complains that there was insufficient evidence to support the jury's award of $1,040,000 in actual damages because Southwest presented no objective evidence that FieldTurf caused any customers to choose its product over AstroPlay. Since Southwest presented a cumulative damage question, this award compensates Southwest both for its false advertising claims and for FieldTurf's breach of the confidentiality provisions in the Kentucky settlement. We find sufficient evidence to uphold the award.

The jury heard two Southwest executives testify about how FieldTurf's ad campaign harmed the company. Reed Seaton, Southwest's President and CEO, testified that he had personal knowledge of fifteen or twenty prospective accounts that Southwest lost because of FieldTurf's false statements or violations of the Kentucky settlement. Mr. Seaton explained that FieldTurf's salespersons had revealed the terms of the Kentucky settlement to Southwest's potential customers

-8-

and led them to believe that Southwest's all-rubber infill was inferior. That is, after learning that the Kentucky settlement precluded Southwest from selling sand and rubber infills, Southwest's customers viewed its all-rubber infill as an afterthought and lost faith in AstroPlay:

> We're trying to stick to the merits of the product [(AstroPlay)]. And all the customer really wants to speak to is why aren't you selling sand and rubber because we've been told that you can't sell sand and rubber. So it's a very difficult process because you can't explain to them why you can't sell sand and rubber because it was not allowed by the settlement agreement, but yet, the customer, in every case that I was involved with, already knew the terms of the settlement agreement prior to my arrival.

Mr. Seaton's testimony was corroborated in greater detail by James Savoca, Southwest's Chief Operating Officer of Domestic Turf. Mr. Savoca testified that he knew of twenty-nine prospective AstroPlay installations during 2000 that Southwest lost due to FieldTurf's unlawful activities. Of those twenty-nine potential customers, Savoca explained that, in nineteen cases, FieldTurf's negative promotional tactics were the "focal point" and the "reason why we lost the job[s]." He further explained that the average price to install an AstroPlay field was $400,000 and that Southwest typically made a twenty-six to twenty-seven percent net profit on each field.

FieldTurf argues that Seaton and Savoca's testimonies do not constitute objective evidence of lost profits under Great Pines Water Co. v. Liqui-Box Corp., a case in which we set aside an $800,000 damage award for insufficient evidence.[14] We find the facts of that case to be materially distinguishable from the present case. Great Pines, a bottled water distributor, sued the manufacturer for making leaky bottles that ultimately caused Great Pines to lose customers.[15] Three Great Pines

---

[14] 203 F.3d 920, 922–24 (5th Cir. 2000).

[15] Id. at 921.

employees testified on lost profits.[16] The employees offered varying estimates that the company lost between 4,000 and 8,000 orders due to the defective bottles.[17] Not only were their estimates inconsistent, but the employees admitted that they had no oral or written customer feedback to support their conclusions.[18]

The evidence supporting lost profits in this case is clearly more reliable than the evidence offered in Great Pines. Southwest's managers testified about a relatively small number of lost accounts based on their direct contact with the potential customers. And Mr. Savoca offered objective testimony concerning the average profit earned on an installation that reflected his personal experience in the industry. We conclude that this evidence of lost profits was competent enough for the jury to calculate damages "with reasonable certainty."[19]

### C. Submission of Damages in the Form of a General Verdict

Rather than submitting separate damage questions on its Lanham Act and breach of contract claims, Southwest presented a single question in the form of a general verdict. FieldTurf argues that the district court erred in submitting these claims as a general verdict and that we should therefore grant a new trial.

It is well established in this circuit that a single jury question "that submits multiple theories

---

[16] Id. at 923.

[17] Id. at 924.

[18] Id.

[19] Id. at 922 (stating that lost profits need not be "susceptible to exact calculation" and that the amount must only "be shown by competent evidence with reasonable certainty").

is acceptable when each of the theories is sustained by the evidence and legally sound."[20] We have already concluded that there was sufficient evidence to support a judgment on each of Southwest's claims. We therefore find no error on this ground.

### D. Instruction on FieldTurf's Discovery Abuses

FieldTurf next complains that the district court abused its discretion in instructing the jury that it could infer that FieldTurf withheld documents that would have been damaging to its defense. Despite repeated requests and warnings from the district judge, FieldTurf failed to produce hundreds of relevant marketing correspondences that Southwest eventually obtained by directly subpoenaing FieldTurf's customers. When asked why FieldTurf failed to produce these documents, brochures, and E-mails that were sent to prospective customers, FieldTurf executives offered suspect and inadequate explanations. With regard to FieldTurf's failure to produce relevant and damaging E-mails, company president John Gilman explained that his computer had been stolen, that FieldTurf computers were infected with the "I Love You" virus, and that the company does not keep its E-mails. With regard to FieldTurf's failure to produce other relevant documents, Gilman offered no explanation. Based on these facts, the district court did not abuse its discretion[21] in submitting the jury instruction as a discovery sanction for FieldTurf's nondisclosure.[22]

---

[20] Box v. Ferrellgas, Inc., 942 F.2d 942, 944 (5th Cir. 1991); accord United States v. Tomblin, 46 F.3d 1369, 1385 (5th Cir. 1995); Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 603 (5th Cir. 1988); Nowell v. Universal Elec. Co., 792 F.2d 1310, 1312 (5th Cir. 1986).

[21] United States v. Katz, 178 F.3d 368, 372 (5th Cir. 1999) ("We review remedies for discovery violations imposed by a district court for abuse of discretion.").

[22] See Fed. R. Civ. P. 37(c) (allowing district courts to inform the jury of a party's discovery abuse and permitting the judge to order as a sanction that certain matters or facts be taken to be established).

E.  Southwest's Award for Attorneys' Fees

Finally, FieldTurf argues that Southwest was not entitled to its $240,480 award for attorneys' fees.  The district court awarded attorneys' fees under section 38.001 of the Texas Practice and Remedies Code, which makes fees and costs recoverable on a successful breach of contract claim.[23] Section 38.002 of the Texas Practice and Remedies Code, however, conditions the recovery of fees on the claimant's presentment of the claim to the opposing party.[24]  FieldTurf argues that Southwest failed to present its breach of contract claim and therefore is not entitled to recover fees under section 38.001.

The purpose of the presentment requirement under Texas law is "to allow the person against whom the claim is asserted to pay the claim within 30 days after they have notice of the claim without incurring an obligation for attorney's fees."[25]  Although presentment may be informal, it is necessary that the claimant make some form of "presentment of *the contract claim* to the opposing party . . . ."[26]

As its sole evidence that it presented its breach of contract claim, Southwest relies on an April 10, 2000 letter, in which it offered to settle its claims against FieldTurf.  That letter does not constitute adequate presentment of Southwest's breach of contract claims.  Although the letter offers to settle all pending claims against FieldTurf in exchange for $2.5 million and other stipulations, there

---

[23] See Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1997).

[24] Id. § 38.002(2) ("To recover attorney's fees under this chapter . . . the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party . . . .").

[25] Jones v. Kelly, 614 S.W.2d 95, 100 (Tex. 1981).

[26] Id. (emphasis added).

were no contract claims pending against FieldTurf at the time; Southwest did not add breach of contract claims to its complaint until over a month after it presented FieldTurf with the settlement offer. When FieldTurf received the April 10 letter, the only claims pending against it were for trademark infringement, trademark dilution, and unfair competition. Neither Southwest's original complaint nor its offer letter makes any reference to injuries that Southwest suffered due to FieldTurf's breach of the Kentucky settlement. The letter refers to the Kentucky settlement only to state that FieldTurf must confirm its terms to settle the present litigation; it does not allege that FieldTurf ever actually breached the Kentucky settlement. Thus, the district court erred in awarding attorneys' fees on Southwest's breach of contract claims because Southwest failed to present FieldTurf with an opportunity to pay those claims and avoid the burden of paying attorneys' fees.

## III. DISCUSSION OF SOUTHWEST'S CLAIMS

### A. Trademark Infringement

Southwest claims that the district court erred in denying its trademark infringement claim. Specifically, it challenges the district court's findings that (1) FieldTurf's inclusion of "AstroTurf" meta tags[27] on its website was not likely to cause customer confusion and (2) FieldTurf's use of the AstroTurf mark on its website constituted fair use of the mark.

"The gravamen for any action of trademark infringement . . . is whether the challenged mark

---

[27] Meta tags are essentially programming code instructions given to on-line search engines. "Although normally invisible to the Internet user, meta-tags are detected by search engines and increase the likelihood that a user searching for a particular topic will be directed to that Web designer's page." *Nat'l A-1 Adver., Inc. v. Network Solutions, Inc.*, 121 F. Supp. 2d 156, 164 (D.N.H. 2000). Hidden in the code of FieldTurf's webpage were several "AstroTurf" meta tags. As a result, web browsers searching for "AstroTurf" would find links to FieldTurf's website, sometimes even before they found their way to Southwest's website.

is likely to cause confusion."[28]  In this circuit, whether FieldTurf's use of the "AstroTurf" trademark is "likely to cause confusion" is a question of fact which can only be set aside if clearly erroneous.[29]

Southwest asserts that the district court misapplied trademark law by ignoring the possibility that FieldTurf's meta tags created "initial interest confusion" for web browsers searching for "AstroTurf."  Contrary to Southwest's assertion, the district court acknowledged that a likelihood of confusion can be established through initial interest confusion.  The court found, however, that there was no evidence of "even fleeting customer confusion" in this case, rightfully distinguishing it from Elvis Presley Enterprises Inc. v. Capece.[30]  In Elvis Presley Enterprises, we upheld a finding of trademark infringement based on the "initial interest" confusion experienced by patrons of a bar called "The Velvet Elvis."[31]  Several customers testified that they initially entered the bar believing that it was affiliated with rock 'n' roll legend Elvis Presley, and that even after determining that it was not affiliated with Mr. Presley, some customers continued to patronize the bar.[32]   Contrary to Elvis Presley Enterprises, there is no evidence in this case that any customers visited FieldTurf's website intending to purchase AstroTurf.  Southwest proffers the testimony of its Internet expert, Eric Peabody, as proof of customer confusion.  Mr. Peabody's testimony was limited, however, to demonstrating that a web browser search for "AstroTurf" would generate hits on FieldTurf's website; it provided no insight into whether these hits actually or initially confused any customers.

---

[28]   Marathon Mfg. Co. v. Enerlite Prods., 767 F.2d 214, 217 (5th Cir. 1985) (citations omitted).

[29]   Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258 (5th Cir. 1980).

[30]   141 F.3d 188 (5th Cir. 1998).

[31]   Id. at 204.

[32]   Id.

Furthermore, Southwest mistakenly argues that meta tagging another company's trademark necessarily constitutes trademark infringement. The meta tag cases in which our sister circuits have found trademark infringement involve either evidence of customer confusion or evidence that the meta tags were used illegitimately. For instance, in <u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.</u>, the Ninth Circuit held that West Coast infringed Brookfield's trademark term in part by encoding it into the meta tags of its website.[33] Brookfield produced computer software packages under the "MovieBuff" trademark and marketed them through its website, www.moviebuffonline.com. Brookfield's MovieBuff software offered information useful to professionals in the entertainment industry, including databases and software applications containing movie credits, box office receipts, and listings of actors, directors, and agents. West Coast ran a website named www.moviebuff.com that offered a searchable entertainment database similar to Brookfield's. The court found that West Coast's use of the "MovieBuff" trademark both in its domain name and through its imbedded meta tags was likely to cause customer confusion largely because it offered a nearly identical service marketed under Brookfield's trademark. Because West Coast's website made no legitimate reference to Brookfield's product and used the "MovieBuff" trademark exclusively to market its own product, the court held that the use was likely to confuse Internet browsers and exploit Brookfield's goodwill.

The Ninth Circuit recently explained in <u>Playboy Enterprises, Inc. v. Welles</u>, however, that meta tagging another party's trademark does not necessarily constitute trademark infringement.[34] Terri Welles, the 1981 Playboy Playmate of the Year, maintains an independent website showcasing

---

[33] 174 F.3d 1036, 1061–65 (9th Cir. 1999).

[34] 279 F.3d 796, 804 (9th Cir. 2002).

erotic images of herself.[35] The website advertises Ms. Welles as a former Playboy Playmate and contains the meta tags "Playboy" and "Playmate," both of which are registered trademarks of Playboy Enterprises, Inc. ("PEI").[36] Although Internet searches of the terms "Playboy" and "Playmate" generated hits to Ms. Welles's site, the court held that Ms. Welles had not infringed PEI's trademarks because her use of the marks was nominative.[37] Despite Ms. Welles's competition with PEI in the sale of adult web content, her reference to PEI's marks was legitimate and practically necessary to adequately describe the actual content of her site.[38]

FieldTurf had similarly legitimate reasons for meta tagging Southwest's "AstroTurf" mark.[39] As the district court noted, FieldTurf's website engaged in comparative advertising with AstroTurf, including links to third-party articles on AstroTurf. This circuit has acknowledged that a party engaged in direct advertising may make "nominative use" of a competitor's trademark as long as the party uses only so much of the mark as is necessary to identify the competing product, and the party does nothing to suggest affiliation, sponsorship, or endorsement by the markholder.[40] FieldTurf's

---

[35] Id. at 799.

[36] Id. at 800.

[37] Id. at 804.

[38] Id.

[39] Contrary to Southwest's assertions, the fact that FieldTurf made some false and misleading statements about "AstroPlay"does not undermine FieldTurf's claim that it made legitimate references to "AstroTurf" for product comparison purposes. Southwest has already recovered for the false and misleading statements that FieldTurf made about AstroPlay; the present claim concerns the separate question of whether FieldTurf's use of the AstroTurf trademark created a likelihood of confusion as to the source of the information on FieldTurf's website.

[40] Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 546 (5th Cir. 1998).

website does not suggest any affiliation or endorsement by Southwest; rather, its site contains several articles highlighting the differences between its product and AstroTurf. Thus, in light of FieldTurf's legitimate references to AstroTurf and the complete absence of actual or initial customer-confusion evidence, the district court's refusal to find trademark infringement was not clearly erroneous. Furthermore, because we find that FieldTurf was not liable for trademark infringement, we need not decide whether, as FieldTurf claims, the "AstroTurf" mark has become generic.

## B. Denial of Permanent Injunctive Relief

Southwest next contends that the district court abused its discretion in denying its post-trial motion for permanent injunctive relief. Southwest proffered thirteen specific statements that FieldTurf should be enjoined from making and eleven statements that FieldTurf must affirmatively post on its website and distribute to customers to correct the false impression created by its false advertising.

"An order granting or denying a preliminary injunction will be reversed only upon a showing that the district court abused its discretion."[41] "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunction relief."[42] The district court's statements imply that a permanent injunction prohibiting FieldTurf employees from making certain statements and requiring them to make other statements would be difficult or impossible to

---

[41] Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co., 195 F.3d 765, 772 (5th Cir. 1999).

[42] Causeway Med. Suite v. Ieyoub, 109 F.3d 1096, 1102 (5th Cir. 1977).

enforce. The court also noted that there was no evidence that FieldTurf continued to engage in false advertising after trial. Based on these reasonable conclusions, we cannot say that the district court clearly abused its discretion in denying Southwest's request for permanent injunctive relief.[43]

### C. Refusal to Award an Accounting of FieldTurf's Profits

Southwest also contends that the district court abused its discretion in denying it recovery of the profits that FieldTurf earned as a result of its false advertising campaign. Section 1117(a) of the Lanham Act entitles a markholder to recover the defendant's profits, subject to the principles of equity.

> An award of the defendant's profits is not automatic, and is committed to the discretion of the district court, whose decision we review for an abuse of discretion. While this court has not required a particular factor to be present, relevant factors to the court's determination of whether an award of profits is appropriate include, but are not limited to, (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.[44]

In this case, we cannot say that the district court abused its discretion in denying an accounting of profits. Although there is some evidence that FieldTurf intended to mislead customers and there is certainly an interest in making this conduct unprofitable, the other factors could reasonably be seen to weigh against an accounting of profits. First, the $1.04 million dollars in lost profits that the jury awarded to Southwest could certainly be seen as an adequate remedy in this case. Second, because of the way that Southwest presented its damage evidence in this case, it is impossible to tell which

---

[43] See, e.g., Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 420 (1981) (acknowledging that courts are reluctant to grant injunctions that would be difficult to enforce); Moto-Sports, Inc. v. Gulf States Toyota, Inc., 324 F. Supp. 653, 656 (S.D. Tex. 1971) (stating that injunctive relief is appropriately denied if it involves the "impossible task of supervising continuous performance").

[44] Pebble Beach, 155 F.3d at 554 (citations omitted).

-18-

sales were diverted as a result of FieldTurf's breach of the Kentucky settlement and which sales were diverted as result of FieldTurf's false or misleading advertising. Finally, there is no evidence that FieldTurf palmed its product off as one of Southwest's products.

## D. Denial of Prejudgment Interest

Southwest next contends that the district court abused its discretion in denying prejudgment interest on Southwest's breach of contract claims. With regard to Southwest's request for prejudgment interest, the district court held that "there is no way in the record of this case the Court can determine applicable dates when damages occurred, therefore, the Court declines to award the same." This reasoning for denying prejudgment interest was erroneous because prejudgment interest under Texas law begins to accrue on the earlier of 180 days after the date a defendant receives written notice of a claim or the date the suit is filed.[45] Notwithstanding this error, the district court did not abuse its discretion in denying Southwest's request for prejudgment interest.[46] As the district court cautioned on several occasions, Southwest's submission of a general damage question made it impossible for the court to determine which portion of the award was attributable to its breach of contract claims and which portion was attributable to its false advertising claims. Because Southwest is seeking prejudgment interest only on its breach of contract claim, there is no way for the district court to determine which portion of the damage award is chargeable with interest. The denial of

---

[45] Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 530–31 (Tex. 1998).

[46] Cf. Coxson v. Commonwealth Mortgage Co. of Amer., 43 F.3d 189, 192–93 (5th Cir. 1995) (holding that the district court did not abuse its discretion in denying prejudgment interest where there was a legitimate reason to do so, notwithstanding that the court failed to justify its decision).

-19-

prejudgment interest therefore did not constitute an abuse of discretion.[47]

### E.  Denial of Attorneys' Fees Under 15 U.S.C. § 1117(a)

Finally, Southwest argues that the district court abused its discretion in declining to award attorneys' fees under 15 U.S.C. § 1117(a).  The Lanham Act provides that a court may award the prevailing party reasonable attorneys' fees in "exceptional cases."[48]  As we explained in <u>Seven-Up Co. v. Coca-Cola Co.</u>, the prevailing party bears the heavy burden of establishing that a case is exceptional, and the district court has broad discretion to determine whether a case qualifies as such:

> The prevailing party has the burden to demonstrate the exceptional nature of a case by clear and convincing evidence.  The determination as to whether a case is exceptional is left to the sound discretion of the trial court.  An exceptional case is one where the violative acts can be characterized as "malicious," "fraudulent," "deliberate," or "willful."  We have recognized that the statutory provision has been interpreted by the courts "to require a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud," and a few cases have gone as far as to require "very egregious conduct" to constitute an "exceptional" case.[49]

We agree with the district court that whether this qualifies as an "exceptional case" under the Lanham Act is a close question.  But mindful that "the district court heard the evidence, saw the witnesses,

---

[47] <u>See</u> <u>Daniels v. Pipefitters' Ass'n Local Union</u>, 945 F.2d 906, 925 (7th Cir. 1991) (denying prejudgment interest "[b]ecause the jury awarded a general verdict . . . [and] the district judge had no way of reading the minds of the deliberating jurors to determine how they arrived at the final, comprehensive amount"); <u>Landes Constr. Co. v. Royal Bank of Canada</u>, 833 F.2d 1365, 1375 (9th Cir. 1987) (holding that the district court did not err in denying prejudgement interest on a general verdict even though it may have considered some irrelevant factors in its determination); <u>Wojtkowski v. Cade</u>, 725 F.2d 127, 129 (1st Cir. 1983) (holding that the district court did not abuse its discretion in denying prejudgment interest on a general verdict with mixed federal and state claims because the court could not determine to what extent the award was based on state claims); cf. <u>Arleth v. Freeport-McMoran Oil & Gas Co.</u>, 2 F.3d 630, 636 (5th Cir. 1993) (recognizing the holding in <u>Wojtkowski</u>, but distinguishing it in the case where the same damages flow from each of the causes of action constituting the general verdict).

[48] 15 U.S.C. § 1117(a).

[49] 86 F.3d 1379, 1390 (5th Cir. 1996) (citations omitted).

and appraised their motives,"[50] we cannot say that the district court abused its discretion in denying the recovery of attorneys' fees in this case.

## IV.  CONCLUSION

Because Southwest failed to satisfy the presentment requirement under Texas law, we vacate the award of attorneys' fees on Southwest's breach of contract claim and render judgment on that issue in favor of FieldTurf.  On all other grounds, we affirm.

**AFFIRMED IN PART, VACATED IN PART, AND RENDERED**.

---

[50] Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1127 (5th Cir. 1991) (internal quotation and citation omitted).